SEYMOUR, Circuit Judge.
On a dark and rainy night in October 2011, Samuel Pauly was shot to death through the window of his rural New Mexico home by one of three state police officers investigating an earlier road rage incident on Interstate 25 involving his brother. On behalf of Samuel Pauly’s estate, his father filed a civil rights action against the three officers, the State of New Mexico Department of Public Safety, and two state officials, claiming defendants violated his son’s Fourth Amendment right against the use of excessive force.[1] The officers moved for summary judgment, asserting qualified immunity. The district court denied their motions, and they appeal. We affirm.
I
Background
In reviewing an interlocutory appeal from the denial of qualified immunity, “we ‘take, as given, the facts that the district court assumed when it denied summary judgment.’ ” Morris v. Noe, 672 F.3d 1185, 1189 (10th Cir.2012) (quoting Johnson v. Jones, 515 U.S. 304, 319, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)). To be sure, “[w]e may review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly estab *1065 lished constitutional right, but we may not consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove.” Id. (internal quotation marks omitted). When we recite the facts of the case, “we view the evidence in the light most favorable to the non-moving party.” Weigel v. Broad, 544 F.3d 1143, 1147 (10th Cir.2008) (internal quotation marks omitted). Accordingly, the following facts are taken directly from the material facts section in the district court orders denying qualified immunity,[2] where the court noted that its “recitation of material facts and reasonable references reflect the Plaintiffs’ version of the facts as gleaned from the evidence of record and excludes facts, contested or otherwise, which are not properly before this Court in the motions for summary judgment.” Aplt.App. at 693.

A. Facts

The incidents underlying this action started the evening of October 4, 2011, when Daniel Pauly became involved in a road rage incident with two females on the interstate highway going north from Santa Fe, New Mexico. One of the women called 911 to report a “drunk driver,” claiming the driver was “swerving all crazy” and turning his lights off and on. Id. at 694. The women then started to follow Daniel on Interstate 25, apparently tailgating him.
Daniel pulled his truck over at the Glo-rieta exit, as did the female driver of the car. Daniel felt threatened by the women and asked them why they were following him with their bright lights on. During this confrontation one of ,the women claimed Daniel was “throwing up gang signs.” Id. He then left the off-ramp and drove a short distance to the house where he lived with his brother, Samuel. The house is located in a rural wooded area on a hill behind another house.
At some point between 9:00 and 10:00 p.m., a state police dispatcher notified Officer Truesdale about the 911 call. Officer Truesdale proceeded to the Glorieta off-ramp to speak to the women about the incident. Daniel had already left when Officer Truesdale arrived on scene. Officers Mariscal and White were also on their way to the off-ramp to assist Officer Truesdale. The women told Officer Trues-dale that Daniel was driving recklessly. They described his vehicle as a gray Toyota pickup truck and provided dispatch with his license plate number. Dispatch notified Officer Truesdale that the Toyota pickup truck was registered to an address on Firehouse Road near the Glorieta off-ramp.
The women then went on their way, and at that point “any threat to [them] was over.” Id. at 676. Officers White and Mariscal arrived to join Officer Truesdale. The officers all agreed that there was not enough evidence or probable cause to arrest Daniel, and that no exigent circumstances existed at the time. Nevertheless, the officers decided to try and speak with Daniel to get his side of the story, “to make sure nothing else happened,” and to find out if he was intoxicated. Id. at 677. Officers Truesdale and Mariscal decided they should take separate patrol units to the Firehouse Road address in Glorieta to see if they could locate Daniel’s pickup truck. Officer White stayed at the off-ramp in case Daniel returned. Although it was dark and raining by that time, none of the officers were wearing raincoats.
*1066 Officers Mariscal and Truesdale proceeded to the Firehouse Road address and parked along the road in front of the main house. Both vehicles had their headlights on and one vehicle had its takedown lights on, but neither vehicle had activated its flashing lights. The officers did not see Daniel’s truck at the main house but behind it they noticed a second house with its lights and porch lights on. They decided to approach the second house in an attempt to locate Daniel’s pickup truck. As they walked towards that house, the officers did not activate their security lights.
To maintain officer safety, Officers Mar-iscal and Truesdale approached the second house in a manner such that neither brother knew the officers were at the property. The officers did not use their flashlights at first, and then only used them intermittently. Officer Truesdale turned on his flashlight as he got closer to the front door of the brothers’ house. Through the front windows, the officers could see two males moving inside the house. When they located Daniel’s Toyota pickup truck, they contacted Officer White to so advise him. Officer White then left to join them.
At roughly 11:00 p.m., the brothers could see “through the front window two blue LED flashlights, five or seven feet apart, coming towards the house.” Id. at 678. Daniel could not tell who was holding the flashlight approaching the house because of the dark and the rain but he feared it could be intruders related to the prior road rage altercation. “[I]t did not enter Daniel Pauly’s mind that the figures could have been police officers.” Id. The brothers hollered several times, “Who are you?” and, “What do you want?” Id. In response, the officers laughed and said: “Hey, (expletive), we got you surrounded. Come out or we’re coming in.” Id. Officer Truesdale also shouted once, “Open the door, State Police, open the door,” while Officer Mariscal stated, “Open the door, open the door.” Id. at 678-79. Daniel did not hear anyone say “State Police” until after the entire altercation was over. Id.
Fearing for their lives and the safety of their dogs, the brothers decided to call the police to report the unknown intruders. Before Daniel could call 911, however, he heard someone yell: “We’re coming in. We’re coming in.” Id. at 679. Believing that an invasion of their home was imminent, Samuel retrieved a loaded handgun for himself as well as a shotgun and ammunition for Daniel. Daniel told his brother he would fire some warning shots while Samuel went back to the front of the house. One of the brothers then hollered, “We have guns.” Id. at 679. The officers saw an individual run to the back of the house, so Officer Truesdale proceeded to position himself towards the rear of the house. He then shouted, “Open the door, come outside.” Id.
While Officers Truesdale and Mariscal were attempting to get the brothers to come outside, Officer White arrived at the Firehouse Road address and approached the house in the back, using his flashlight periodically. He saw individuals moving inside the house and arrived just as one of the brothers said: “We have guns.” Id. at 680. Officer White testified in his deposition that when he heard this statement he immediately drew his weapon and took cover behind a stone wall fifty feet away from the front of the brothers’ house. Id. at. 221; see also id. at 680. Officer Maris-cal also took cover behind a pickup truck, while Officer Truesdale remained in his position at the back of the house.
Because of the prior threatening statements made by Officer Truesdale and Mariscal, Daniel did not feel comfortable stepping out of the front door to fire warning shots. But a few seconds after the officers heard, “We have guns,” id. at 680, Daniel stepped partially out of the back *1067 door and fired two warning shots while screaming loudly to scare anyone off. Officer White thought Officer Truesdale had been shot after hearing the two shotgun blasts.[3] A few seconds after Daniel fired the warning shots, Officer Mariscal and White noticed Samuel open the front window and point a handgun in Officer White’s direction. Officer Mariscal testified he immediately shot at Samuel but missed. “Four to five seconds after Samuel Pauly pointed his handgun at Officer White, Officer White shot Samuel” from his covered position fifty feet away. Id. at 681. The entire incident took less than five minutes.

B. Procedural History

Plaintiff Daniel T. Pauly, as the personal representative of the Estate of Samuel Pauly, filed suit against Officers Mariscal, Truesdale, and White, the State of New Mexico Department of Public Safety (NMDPS), and two state officials. He alleged an excessive force claim under 42 U.S.C. § 1983 and several state law claims. Plaintiffs seek compensatory damages, punitive damages, pre- and post-judgment interest, and costs and attorneys’ fees on their federal and state law claims. Relevant here is plaintiff estate’s § 1983 claim against all three officers for violating Samuel Pauly’s Fourth Amendment right to be free from excessive force.
All three officers moved for summary judgment and raised the defense of qualified immunity with respect to the § 1983 excessive force claim. Defendants analyzed the excessive force claim by reviewing the actions of each deputy individually, not their actions as a whole. They all argued they were entitled to qualified immunity because plaintiff estate could not show Samuel’s claimed Fourth Amendment rights were clearly established or violated, and in any event their actions were objectively reasonable.
Specifically, Officer White asserted that when Samuel pointed the gun in his direction, any .police officer would have reasonably assumed his life was in danger whether or not Samuel intended to fire, and deadly force was therefore justified under the totality of the circumstances. He contended it was not feasible for him to warn Samuel to drop his weapon.
Officer Truesdale argued it was undisputed that he did not fire his weapon at Samuel Pauly and therefore he could only be liable if his pre-seizure conduct “created the need for deadly force in this incident through his own reckless, deliberate conduct” that “was immediately connected to Officer White’s use of force in self-defense.” ApltApp. at 359. He then argued that his actions leading up to the use of force were reasonable and that even if he made mistakes in how he approached the house, none of his conduct preceding the use of force by Officer White was reckless or deliberate. He further claimed his actions were not the but for or proximate cause of Samuel’s death because the brothers’ own actions were “independent and unexpected intervening events” amounting to a superseding cause of death that defeated any liability on his part. Id. at 363-64.
Officer Mariscal argued that when he saw Samuel point the gun at Officer White, “he was clearly justified in using deadly force in defense of Officer White’s life.”Id. at 392-93. Like Officer Truesdale, Of *1068 ficer Mariscal contended that his actions leading up to the use of force were not reckless or deliberate, and that his pre-seizure conduct was not the but for or proximate cause of Samuel’s death.
The district court issued two orders, denying summary judgment on all claims. In its first order, the court denied Officer White qualified immunity, concluding that “the record contains genuine disputes of material fact regarding whether the officers’ conduct prior to the shooting of Samuel Pauly was at the very least reckless and unreasonably precipitated Officer White’s need to shoot Samuel Pauly.” Id. at 684. Based on the record, the court also determined that
it is disputed whether (1) the Officers adequately identified themselves, either verbally or by using a flashlight; (2) the brothers could, nonetheless, see the Officers considering the ambient light and other light sources; and (3) it was feasible for Officer White to warn Samuel Pauly before shooting him.
Furthermore, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find the following: there were no exigent circumstances requiring the Officers to go to Daniel Pauly’s house at 11:00 p.m.; Officers Truesdale and Mariscal purposefully approached the house in a surreptitious manner; despite the porch light and light from the house, the rain and darkness made it difficult for the brothers to see who was outside their house; the fact that the brothers’ house is located in a rural wooded area would have heightened the brothers’ concern about intruders; the Officers provided inadequate police identification by yelling out “State Police” once; the Officers’ use of a hostile tone in stating, “we got you surrounded. Come out or we’re coming in” was threatening; statements by Officers Truesdale and Mariscal of “open the door” and other statements of “we’re coming in” were, likewise, threatening; it would have been reasonable for the Officers to conclude that Daniel Pauly could believe that persons coming up to. his house at 11:00 p.m. were connected to the road rage incident which had occurred a couple of hours previously; that under these circumstances, the occupants of the house would feel a need to defend themselves and their property with the possible use of firearms; and the incident occurred in less than five minutes.
Id. at 684-85. The court made virtually the same determinations in its separate order denying qualified immunity to Officers Truesdale and Mariscal. Id. at 703-04.
All officers appeal the denial of their qualified immunity.
II
Jurisdiction
We have jurisdiction under 28 U.S.C. § 1291 to review “all final decisions of the district courts of the United States.” Generally, “[o]rders denying summary judgment are ... not appealable final orders for purposes of 28 U.S.C. § 1291.” Roosevelt-Hennix v. Prickett, 717 F.3d 751, 753 (10th Cir.2013); see also Coopers & Lybrand v. Livesay, 437 U.S. 463, 467, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). “The denial of qualified immunity to a public official, however, is immediately ap-pealable under the collateral order doctrine to the extent it involves abstract issues of law.” Fancher v. Barrientos, 723 F.3d 1191, 1198 (10th Cir.2013); accord Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (“[W]e hold that a district court’s denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable ‘final decision’ within the meaning of 28 U.S.C. § 1291 notwithstanding the absence *1069 of a final judgment.”). Appealable matters thus involve “disputes about the substance and clarity of pre-existing law,” not about “what occurred, or why an action was taken or omitted.” Ortiz v. Jordan, 562 U.S. 180, 190, 131 S.Ct. 884, 178 L.Ed.2d 703 (2011).
Accordingly, under our limited jurisdiction we may review “ ‘(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation.’ ” Roosevelt-Hennix, 717 F.3d at 753 (quoting Allstate Sweeping, LLC v. Black, 706 F.3d 1261, 1266-67 (10th Cir.2013)). “Ordinarily speaking, it is only these latter two questions — and not questions about what facts a jury might reasonably find — that we may consider in appeals from the denial of qualified immunity at summary judgment.” Lewis v. Tripp, 604 F.3d 1221, 1225 (10th Cir.2010).
In contrast, we have no interlocutory jurisdiction to review “whether or not the pretrial record sets forth a ‘genuine’ issue of fact for trial.” Johnson v. Jones, 515 U.S. 304, 320, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). “[T]he Supreme Court [has] indicated that, at the summary judgment stage at least, it is generally the district court’s exclusive job to determine which facts a jury could reasonably find from the evidence presented to it by the litigants.” Lewis, 604 F.3d at 1225 (citing Jones, 515 U.S. at 313, 115 S.Ct. 2151). Thus, “if a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated that we usually must take them as true — and do. so even if our own de novo review of the record might suggest otherwise as a matter of law.” Id.; see also Cortez v. McCauley, 478 F.3d 1108, 1115 (10th Cir.2007) (“Our interlocutory jurisdiction is limited to legal questions drawn from facts that are deemed undisputed for appellate purposes.”). To the extent the officers raise only issues of law in their appeals, we have jurisdiction.
Ill
Applicable Law

A. Section 1983 and Qualified Immunity

Title “42 U.S.C. § 1983 allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law.” Cillo v. City of Greenwood Village, 739 F.3d 451, 459 (10th Cir.2013). “Individual defendants named in a § 1983 action may raise a defense of qualified immunity,” id., which “protects ‘government officials performing discretionary functions’ and shields them from ‘liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a rea sonable person would have known.’ ” Swanson v. Town of Mountain View, Colo., 577 F.3d 1196, 1199 (10th Cir.2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). “When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established.” Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir.2009); Pearson v. Callahan, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). “If the plaintiff[s] satisfy! ] this two-part test, ‘the defendant bears the usual burden of a party moving for summary judgment to show that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.’ ” Trask v. Franco, 446 F.3d 1036, 1043 (10th Cir.2006) (quoting Axson-Flynn v. Johnson, 356 F.3d 1277, 1299 (10th Cir.2004)).

*1070
B. Excessive Force

“We review Fourth Amendment claims of excessive force under a standard of objective reasonableness, judged from the perspective of a reasonable officer on the scene.” Tenorio v. Pitzer, 802 F.3d 1160, 1162 (10th Cir.2015) (citing Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). And “[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the' amount of force that is necessary in a particular situation.” Id. (quoting Graham, 490 U.S. at 396-97, 109 S.Ct. 1865). In Graham, 490 U.S. at 396, 109 S.Ct. 1865, the Supreme Court held “all claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other ‘seizure’ of a free citizen should be analyzed under the Fourth Amendment and its ‘reasonableness’ standard.”
In an excessive force case such as this, we ask “ ‘whether the officers’ actions are ‘objectively reasonable’ in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.’” Thomson v. Salt Lake Cnty., 584 F.3d 1304, 1313 (10th Cir.2009) (quoting Graham, 490 U.S. at 397, 109 S.Ct. 1865). “Determining whether the force used to effect a particular seizure is ‘reasonable’ under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the countervailing governmental interest at stake.” Graham, 490 U.S. at 396, 109 S.Ct. 1865 (internal quotation marks omitted); see also Scott v. Harris, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (“[W]e must balance the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.” (quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983))). Indeed, this balancing test “requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Graham, 490 U.S. at 396, 109 S.Ct. 1865.
“In determining whether an officer’s use of force was excessive, many [of our] cases have focused solely on the three factors specifically described in Graham.” Id. (citing Casey v. City of Fed. Heights, 509 F.3d 1278, 1281 (10th Cir.2007)). “However, these three factors were not intended to be exclusive, and the circumstances of a particular case may require the consideration of additional factors.” Id. When confronted with whether the use of deadly force was reasonable, we have held that “an officer’s use of that force is reasonable only ‘if a reasonable officer in Defendants’ position would have had probable cause to believe that there was a threat of serious physical harm to themselves or others.’ ”[4] Thomson, 584 F.3d at 1313 (quoting Estate of Larsen, 511 F.3d at 1260); accord Jiron v. City of Lakewood, 392 F.3d 410, 415 (10th Cir.2004) (“In other words, ‘[a]n officer’s use of *1071 deadly force in self-defense is not constitutionally unreasonable.’ ” (quoting Romero v. Bd. of County Comm’rs, 60 F.3d 702, 703-04 (10th Cir.1995))). Moreover,
In assessing the degree of threat the suspect poses to the officers, we consider factors that include, but are not limited to: “(1) whether the officers ordered the suspect to drop his weapon, and the suspect’s compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.”
Thomson, 584 F.3d at 1314-15 (quoting Estate of Larsen, 511 F.3d at 1260).
In addition, we have held that “[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers’ own ‘reckless or deliberate conduct during the seizure unreasonably created the need to use such force.’ ” Jiron, 392 F.3d at 415 (quoting Sevier v. City of Lawrence, Kan., 60 F.3d 695, 699 (10th Cir.1995)). To be sure, we “consider an officer’s conduct prior to the suspect’s threat of force if the conduct is ‘immediately connected’ to the suspect’s threat of force.” Allen v. Muskogee, 119 F.3d 837, 840 (10th Cir.1997) (quoting Romero, 60 F.3d at 705 n. 5); c.f., Tennessee v. Garner, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (“[I]t is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out.”). “Mere negligent actions precipitating a confrontation would not, of course, be actionable under § 1983.” Sevier, 60 F.3d at 699 & n. 7.
We recognize that “officers are sometimes ‘forced to make split-second judgments’ in uncertain and dangerous circumstances,” and “[w]hat may later appear to be unnecessary when reviewed from the comfort of a judge’s chambers may nonetheless be reasonable under the circumstances presented to the officer at the time.” Phillips v. James, 422 F.3d 1075, 1080 (10th Cir.2005) (quoting Graham, 490 U.S. at 395, 396-97, 109 S.Ct. 1865). Ultimately, however, “the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.” Estate of Larsen, 511 F.3d at 1260.
IV
Discussion
“Although we frequently conduct separate qualified immunity analyses for different defendants, we have not always done so at the summary judgment stage of excessive force cases.” Estate of Booker v. Gomez, 745 F.3d 405, 421 (10th Cir.2014). Indeed, when appropriate we will consider the officers’, conduct in the aggregate. See, e.g., Lundstrom v. Romero, 616 F.3d 1108, 1126-27 (10th Cir.2010); Fisher v. City of Las Cruces, 584 F.3d 888, 895-902 (10th Cir.2009); York v. City of Las Cruces, 523 F.3d 1205, 1210-11 (10th Cir.2008); Weigel v. Broad, 544 F.3d 1143, 1155 (10th Cir.2008). However, we have also analyzed the conduct of each officer individually in excessive force cases at the summary judgment stage. See, e.g., Casey, 509 F.3d at 1282-87; Walker v. City of Orem, 451 F.3d 1139, 1159-61 (10th Cir.2006); Currier v. Doran, 242 F.3d 905, 919-25 (10th Cir.2001).
The facts and circumstances of the present case warrant analyzing the conduct of Officer White separately from the other officers, while considering the conduct of Officer Mariscal and Truesdale in the aggregate. Accordingly, we will follow the district court in analyzing the reasonableness of Officers Truesdale’s and Mariscal’s actions together in one section, and then *1072 the conduct of Officer White in a separate section.

A. Officers Mariscal and Truesdale

Officers Mariscal and Truesdale argue on appeal that even viewing the facts found by the district court in the light most favorable to plaintiffs and accepting them as true, the officers’ actions were objectively reasonable under the circumstances. Specifically, Officer Mariscal argues a reasonable officer in his position would have believed Officer White’s life was in danger, and thus his use of force was objectively reasonable. Officer Trues-dale contends that since he was at the rear of the house when Officer White shot Samuel Pauly, his use of force is not even at issue. Both Officers claim they cannot be held liable for Officer White’s objectively reasonable use of force because neither officers’ pre-seizure conduct was reckless nor the proximate cause of Samuel Pauly’s death.

1. Pre-seizure conduct and proximate cause

“Section 1983 imposes liability on a government official who ‘subjects, or causes to be subjected, any citizen ... to the deprivation of any rights.’ ” Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir.2012) (quoting 42 U.S.C. § 1983). We have stated accordingly that “[ajnyone who ‘causes’ any citizen to be subjected to a constitutional deprivation is also liable.” Trask, 446 F.3d at 1046. “ ‘The requisite causal connection is satisfied if the defendants] set in motion a series of events that the defendants] knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights.’ ” Id. (quoting Snell v. Tunnell, 920 F.2d 673, 700 (10th Cir.1990)). To be sure, “[s]ection [1983] should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.” Martinez, 697 F.3d at 1255.
In other words, Officers Maris-cal and Truesdale may be held liable if their conduct immediately preceding the shooting was the but-for cause of Samuel Pauly’s death, and if Samuel Pauly’s act of pointing a gun at the officers was not an intervening act that superseded the officers’ liability. “Foreseeable intervening forces are within the scope of the original risk, and ... will not supercede the defendant’s responsibility.” Trask, 446 F.3d at 1047 (internal quotation marks omitted). Both officers claim they cannot be the proximate cause of Samuel Pauly’s death, even assuming their pre-seizure conduct was negligent or reckless, because “neither officer could have foreseen that the two males inside the residence would suddenly threaten them and open fire,” and “[u]nder the circumstances, the brothers’ wholly disproportionate and unexpected response constituted superseding events that relieved” the officers from liability. Aplt. Br. at 55. We are not persuaded.
Here, taking the facts and reasonable inferences the district court determined, the brothers were in their home when Officers Truesdale and Mariscal approached it at night when it was raining and made threatening comments about intruding into the home to get the brothers. The Supreme Court has long recognized— and continues to recognize — the individual’s constitutional right to use arms to protect his home. See District of Columbia v. Heller, 554 U.S. 570, 628-29, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (striking down a District of Columbia statute prohibiting the possession of handguns in the home). The Court stated:
[T]he inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of “arms” *1073 that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, %vhere the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one’s home and family ... would fail constitutional muster.
Heller, 554 U.S. at 628-29, 128 S.Ct. 2783 (emphasis added) (footnote, citation, and quotation marks omitted).
In State v. Boyett, 144 N.M. 184, 185 P.3d 355, 358-59 (2008), the Supreme Court of New Mexico reiterated that the “[d]efense of habitation has long been recognized in New Mexico,” and that “[i]t gives a person the right to use lethal force against an intruder when such force is necessary to prevent the commission of a felony in his or her home.” The court explained that “[t]he defense is grounded in the theory that ‘[t]he home is one of the most important institutions of the state, and has ever been regarded as a place where a person has a right to stand his [or her] ground and repel, force by force, to the extent necessary for its protection.’ ” Id. at 359 (second and third alteration in original) (quoting State v. Couch, 52 N.M. 127, 193 P.2d 405, 409, (1946)). Accordingly, “in every purported defense of habitation, the use of deadly force is justified only if the defendant reasonably believed that the commission of a felony in his or her home was immediately at hand and that it was necessary to kill the intruder to prevent the occurrence.” Id. (citations omitted).
Significantly, the court in Boyett recognized it had “never held that entry into the defendant’s home is a prerequisite for the defense. On the contrary, the seminal New Mexico case on defense of habitation was clear that, in certain circumstances, it may justify an occupant’s use of lethal force against an intruder who is outside the home.” Id. (citing State v. Bailey, 27 N.M. 145, 198 P. 529, 534 (1921)). Relying on Bailey, the court explained that the “defense of habitation justifies killing an intruder who is assaulting the defendant’s home with the intent of reaching its occupants and committing a felony against them” precisely because “[protecting a defendant’s right to prevent forced entry necessitates that the defense apply when an intruder is outside the home but endeavoring to enter it.” Id.
The defense is relevant here because, as the district court determined, it is disputed whether the officers “adequately identified themselves” and whether the brothers could see the officers outside the lighted house “considering the ambient light and other light sources.” ApltApp. at 703. The district court correctly pointed out that “[t]he outcome of these factual disputes is material to whether the brothers knew that State Police Officers were outside their house prior to Officer White shooting Samuel Pauly.” Id. Because it was objectively reasonable under the circumstances about which the officers were aware that the brothers might believe the officers were intruders, a reasonable jury could find that it was foreseeable the brothers would arm themselves in defense of their home as permitted by New Mexico state law. Boyett, 185 P.3d at 358-59. Thus, Samuel Pauly’s act of pointing a gun out the window in defense of his home would not be an intervening act superseding the liability of the officers.
Our opinion in Trask v. Franco, 446 F.3d 1036, is particularly instructive. There, state probation officers visited the residence of Carly Bliss and Dale Trask for a routine probation field inspection of Ms. Bliss. Id. at 1039. The officers be *1074 lieved Ms. Bliss was still on probation, but her probation had actually been discharged one month earlier. Id. Nobody answered the probation officers’ knock on the door, but the officers could see movement in the house and believed, based on a previous statement Ms. Bliss had made to one of the officers about her abusive relationship with Mr. Trask, that she was afraid to open the door because of him. Id. at 1040. The probation officers therefore requested police assistance to provide support during the inspection. When a New Mexico State Police officer and a sheriffs deputy arrived, Mr. Trask eventually opened the front door. Id. He was wearing at least two knives in sheaths on his belt. Id. A lengthy search of the residence ensued, and the state police officer arrested Mr. Trask. Id. Both Ms. Bliss and Mr. Trask brought a § 1983 action against the probation officers, among others, with Mr. Trask asserting claims for unlawful detention and arrest. Id. at 1040-41. The district court granted summary judgment to the probation officers on Mr. Trask’s unlawful detention and arrest claims, finding no affirmative link between the alleged constitutional deprivations by the state police officer and the probation officers’ duty to control him. Id. at 1041/
We explained that the probation officers could be held liable if they were the proximate cause of the harm but that “a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.” Id. at 1046. Thus, the question was “[wjhether Mr. Trask’s appearance with knives was a superseding act that limited the probation officers’ liability,” and that depended “upon what the probation officers reasonably foresaw when they first called for backup.” Id. at 1046^47. The court held “the record on appeal leaves too much unanswered, and it is premature without more evidence to discern what the probation officers reasonably foresaw when they called for backup.” Id. at 1047. Significantly, we explained:
[T]he reasonable foreseeability of [an intervening act’s occurrence] is a factor in determining whether the intervening act relieves the actor from liability for his antecedent [wrongful act], and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was [wrongful] or foreseeable, the question should be left for the jury.
Id. (second, third, and fourth alteration in original).
Similarly, fact questions remain at a minimum as to whether the officers here could reasonably foresee that the brothers would defend their home with deadly force based on the prior circumstances that night and the officers’ conduct in shouting “we got you surrounded. Come out or we’re coming in.”[5] Thus, because disputed facts remain concerning whether the officers properly identified themselves and whether the brothers knew Officers Maris-cal and Truesdale were intruders or state police, summary judgment is not appropriate.

2. Clearly established law

“The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Saucier v. Katz, 533 U.S. 194, 207, 121 *1075 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Casey, 509 F.3d at 1283-84 (quoting Saucier).
“For a right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers’ actions apparent.” Mascorro v. Billings, 656 F.3d 1198, 1208 (10th Cir.2011); Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (“A Government official’s conduct violates clearly established law when, at the time of the challenged conduct, ‘[t]he contours of [a] right [are] sufficiently clear’ that every ‘reasonable official would have understood that what he is doing violates that right.’ ” (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987))); Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (“For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.”) (internal quotation marks omitted). The Supreme Court recently reaffirmed these principles, noting: “We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.” Mullenix v. Luna, — U.S. —, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting al-Kidd, 563 U.S. at 741, 131 S.Ct. 2074). Indeed, “the dispositive question is ‘whether the viola-tive nature of particular conduct is clearly established,’” id. (quoting al-Kidd, 563 U.S. at 742, 131 S.Ct. 2074) (emphasis added), and “[t]he inquiry ‘must be undertaken in light of the specific context of the case, not as a broad general proposition,’ ” id. (quoting Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam)).
“The plaintiff is not required to show, however, that the very act in question previously was held unlawful in order to establish an absence of qualified immunity.” Weigel, 544 F.3d at 1153 (quoting Cruz v. City of Laramie, 239 F.3d 1183, 1187 (10th Cir.2001)). “[A] general constitutional rule already identified in the deci-sional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.” Hope, 536 U.S. at 741, 122 S.Ct. 2508 (internal quotation marks omitted). Consequently, “officials can still be on notice that their conduct violates established law even in novel factual circumstances.” Id. “The Hope decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional.” Casey, 509 F.3d at 1284 (internal quotations and citations omitted).
This Circuit has adopted a sliding scale to determine when law is clearly established. Id. “The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.” Id. “Thus, when an officer’s violation of the Fourth Amendment is particularly clear from Graham itself, we do not require a second decision with greater specificity to clearly establish the law.” Id.
Since at least 2006, it has been clearly established in this circuit that the requisite causal connection for establishing a Section 1983 violation “is satisfied if the defendants] set in motion a series of events that the defendants] knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights.” Trask, 446 F.3d at 1046 (alteration in original) (quoting Snell v. Tunnell, 920 F.2d 673, 700 (10th Cir.1990)). Likewise, it has been clearly established since 2006 that for an officer to *1076 be liable under Section 1983, the officer’s conduct must be both a but-for and proximate cause of the plaintiffs constitutional harm. Id. Accepting as true plaintiffs’ version of the facts, a reasonable person in the officers’ position should have understood their conduct would cause Samuel and Daniel Pauly to defend their home and could result in the commission of deadly force against Samuel Pauly by Officer White.

B. Officer White

1. Reasonableness of Officer White’s Conduct

As with Officers Mariscal and Truesdale, our analysis of Officer White’s qualified immunity claim focuses on whether his actions were “ ‘objectively reasonable’ in light of the facts and circumstances confronting [him], without'regard to [his] underlying intent or motivation.” Thomson, 584 F.3d at 1313 (quoting Graham, 490 U.S. at 397, 109 S.Ct. 1865). Officer White’s use of deadly force “must be judged from the perspective of a reasonable officer ‘on the scene,’ who is ‘often forced to make split-second judgments ... about the amount of force that is necessary in a particular situation.’ ” Allen, 119 F.3d at 840 (quoting Graham, 490 U.S. at 396-97, 109 S.Ct. 1865).
An officer’s pre-seizure conduct can be part of the reasonableness inquiry, but only if the officer’s own “reckless or deliberate conduct during the seizure unreasonably created the need to use such force.” Jiron, 392 F.3d at 415 (quoting Sevier, 60 F.3d at 699). Officer White did not participate in the events leading up to the armed confrontation, nor was he there to hear the other officers ordering the brothers to “Come out or we’re coming in.” ApltApp. at 678. Almost immediately upon Officer White’s arrival, one of the brothers shouted “We have guns.” The alleged reckless conduct of Officers Maris-cal and Truesdale prior to this point cannot be attributed to Officer White, and accordingly, our analysis focuses only on the reasonableness of his own conduct.
“The Fourth Amendment permits an officer to use deadly force only if there is ‘probable cause to believe that there [is] a threat of serious physical harm to [the officer] or to others.’ ” Tenorio, 802 F.3d at 1164 (quoting Estate of Larsen, 511 F.3d at 1260). In assessing “the degree of threat” the officer faces, “we consider a number of non-exclusive factors” that include: “(1) whether the officers ordered the suspect to drop his weapon, and the suspect’s compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.” Estate of Larsen, 511 F.3d at 1260. But these four factors “are only aids in making the ultimate determination, which is ‘whether from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.’ ” Tenorio, 802 F.3d at 1164 (quoting Estate of Larsen, 511 F.3d at 1260). And ultimately, “[t]he primary focus of our inquiry ... remains on whether the officer was in danger at the exact moment of the threat of force.” Medina v. Cram, 252 F.3d 1124, 1132 (10th Cir.2001) (citing Bella v. Chamberlain, 24 F.3d 1251, 1256 & n. 7 (10th Cir.1994); Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir.1995)).[6]
*1077 We recognize, as the dissent does, that this case presents a unique set of facts and circumstances, particularly in the case of Officer White who arrived late on the scene and heard only ‘We have guns,” Aplt.App. at 680, before taking cover behind a stone wall fifty feet away from the Pauly’s residence. Therefore, in accordance with the Supreme Court’s instruction that we review the reasonableness of Officer White’s actions by balancing “the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion,” Scott, 550 U.S. at 383, 127 S.Ct. 1769 (quoting Place, 462 U.S. at 703, 103 S.Ct. 2637), we will analyze his conduct by weighing the three non-exclusive factors articulated in Graham, 490 U.S. at 396, 109 S.Ct. 1865, as well as the four factors listed in Estate of Larsen, 511 F.3d at 1260, in order to determine whether a constitutional violation occurred.
Because “[t]he test for reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,” we must pay “careful attention to the facts and circumstances” of this particular case when assessing the reasonableness of Officer White’s conduct. Graham, 490 U.S. at 396, 109 S.Ct. 1865. Because “there is no easy-to-apply legal test for whether an officer’s use of deadly force is excessive[ ] ..., we must ‘slosh our way through the fact-bound morass of reasonableness.’ ” Cordova v. Aragon, 569 F.3d 1183, 1188 (10th Cir.2009) (quoting Scott, 550 U.S. at 383, 127 S.Ct. 1769).
The first factor from Graham, “the severity of the crime at issue,” 490 U.S. at 396, 109 S.Ct. 1865, weighs in favor of plaintiff estate. The district court found that once police arrived at the Glorieta off-ramp in response to a call concerning road rage, “the Officers did not believe any exigent circumstances existed,” and that they “did not have enough evidence or probable cause to make an arrest.” Aplt.App. at 677. It is thus unclear from the record what, if any, crime was committed during the road' rage incident. At best, the incident might be viewed as a minor crime such as reckless driving or driving while intoxicated.[7]
At first glance, one could argue that the second factor from Graham, “whether the suspect poses an immediate threat to the safety of the officers or others,” 490 U.S. at 396 109 S.Ct. 1865, weighs in favor of Officer White. But, as the district court determined, “Officer White took cover behind a stone wall located 50 feet from the front of the house and drew his duty weapon while Officer Mariscal took cover behind a Ford pickup truck and unholstered his duty weapon.” Aplt.App. at 680. Moreover, the undisputed facts in the record show that Officer White was behind cover fifty feet away before Samuel Pauly even opened the window. Id. at 680-81. Although the district court found that Samuel “held his arm out with a hand gun, pointing it at Officer White,” id. at 681, it also concluded there was a fact issue as to whether Samuel actually fired the gun, id. nn. 8, 9. Finally, although Officer White claims he thought Officer Truesdale was shot by the two shotgun blasts he heard from behind the house, he admitted in his deposition that “I did not hear anything *1078 that would suggest [Officer Truesdale] had been hit.” Id. at 223.
Significantly, “the law is clear that [Officer White’s] belief must be reasonable.” Attocknie v. Smith, 798 F.3d 1252, 1257 (10th Cir.2015) (petition for cert. filed Dec. 22, 2015). While the dissent concedes that an Officer’s subjective belief is irrelevant, it posits that “Officer White’s uncontro-verted subjective belief is objectively reasonable.” Dissent at 5 n. 1. But “the Fourth Amendment tolerates only reasonable mistakes, and those mistakes-whether of fact or of law-must be objectively reasonable. We do not examine the subjective understanding of the particular officer involved.” Heien v. North Carolina, — U.S. -, 135 S.Ct. 530, 539, 190 L.Ed.2d 475 (2014). In our view, there is at a minimum at least a fact question for the jury as to whether it was objectively reasonable for Officer White to immediately assume that one of his fellow officers was shot after hearing two shots from the back of the house but nothing more to indicate that anyone had been hit. Cf. Attocknie, 798 F.3d at 1257 (affirming denial of qualified immunity to officer and rejecting claim officer saw suspect run into a house, noting “that a jury might reasonably refuse to credit his belief as reasonable” because a jury “could well find that [the officer] is not telling the truth about seeing someone running, or at least that he was not reasonable in inferring that the person he saw was [the suspect], especially given other evidence that [the suspect] was not seen by anyone else at the time and was not found there after the shooting”).
Because Officers White and Mariscal were behind cover some distance away in the dark before Samuel even opened the window and there is a fact issue as to whether Samuel fired his weapon, for purpose of analysis on summary judgment Samuel Pauly did not “pose an immediate threat to the safety of the officers or others.” Graham, 490 U.S. at 396, 109 S.Ct. 1865 (emphasis added).
The third Graham factor, “whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight,” 490 U.S. at 396, 109 S.Ct. 1865, also weighs in favor of plaintiff estate. As the district court determined, after the officers arrived on scene, spoke with the women about the incident, and then allowed the women to leave the Glorieta off-ramp, “any threat to the females was over.” AplhApp. at 676. More importantly, the court recognized that “the Officers did not believe any exigent circumstances existed,” and that at that point, they “did not have enough evidence or probable cause to make an arrest.” Id. (emphasis added). Thus, when the officers, including White, went to the brothers’ residence, they were not there to make an arrest as no grounds existed to do so. This is especially true for Samuel Pauly, who had been in his home playing video games before Daniel arrived that night. Accordingly, the brothers could not have been “attempting to evade arrest by flight,” Graham, 490 U.S. at 396, 109 S.Ct. 1865. This factor supports plaintiff estate.
Because Officer White fired the fatal shot, we turn to the four factors set out in Estate of Larsen, 511 F.3d at 1260, to assess the “degree of threat” he faced. The first factor, “whether the officers ordered the suspect to drop his weapon, and the suspect’s compliance with police commands,” id., clearly supports plaintiff estate. For purposes of qualified immunity, the district court determined that Officer White did not identify himself or order Samuel Pauly to drop his weapon. The second factor, “whether any hostile motions were made with the weapon towards the officers,” id., weighs in favor of Officer White because the district court found that Samuel Pauly pointed a handgun at Officer White, or at least in his direction. The *1079 third factor, “the distance separating the officers and the suspect,” id, clearly supports plaintiff estate because Officer White was at least 50 feet away behind cover when he fired the fatal shot.
We consider the fourth factor, “the manifest intentions of the suspect,” id, to be somewhat neutral. The district court determined “a reasonable jury could find” that “it would have been reasonable for the Officers to conclude that Daniel Pauly could believe that persons coming up to his house at 11:00 p.m. were connected to the road rage incident which had occurred a couple of hours previously,” and “that under these circumstances, the occupants of the house would feel a need to defend themselves and their property with the possible use of firearms.” Aplt.App. at 685. Under the circumstances here, such defense would be permissible under New Mexico state law. See also Boyett, 185 P.3d at 358-59. This conclusion comports with what the Supreme Court made clear in Heller, 554 U.S. at 628-29, 128 S.Ct. 2783, that citizens have the inherent right to use weapons to defend their home against intruders.
Moreover, and importantly, the district court found a genuine fact issue remains as to whether Samuel Pauly even fired his weapon. Although Officers White and Mariscal claim that Samuel fired the handgun, the district court noted
A revolver later found on the living room floor under the front window where Samuel Pauly was shot had one casing forward of the firing pin while the other four chambers were loaded. No bullet casing was recovered from the handgun, so there is no forensic proof that Samuel Pauly fired the handgun that night.
Id. at 681 n. 8, 128 S.Ct. 2783. Significantly, “Officer Mariscal strongly believes that he fired a shot at Samuel Pauly after Samuel Pauly fired the handgun,” and the district court found that “Officer Mariscal was missing one cartridge from his magazine.” Id. at 681 n. 9, 128 S.Ct. 2783 Thus, the court concluded: “since only four shots were fired that night, if Officer Mariscal fired the third shot as he claims and Officer White fired the fourth shot, then Samuel Pauly could not have fired upon Officer WTiite.” Id. At most, from Officer White’s perspective, the manifest intention of Samuel Pauly was unclear at the time Samuel pointed his weapon out of the window of his home.
Officer White stated in his deposition that when he was kneeling behind the rock wall, he saw Samuel Pauly shoot a “silver gun” directly towards his face. Aplt.App. at 223-24, White dep. at 137-44 (“I observed the male, with his right hand, extend his hand in a parallel position to the ground, pointing the gun toward my direction ... [and] I observed the muzzle flash, and I heard the bang of the gun.”). Nevertheless, “[b]ased on the physical evidence, a jury could reasonably decide to reject [Officer White’s] testimony.” Abraham v. Raso, 183 F.3d 279, 294 (3d Cir.1999) (holding fact issue precluded summary judgment on excessive force claim against officer). Indeed, “[considering the physical evidence together with the inconsistencies in the officer’s testimony, a jury will have to make credibility judgments, and credibility determinations should not be made on summary judgment.” Id. Moreover, “since the victim of deadly force is unable to testify, courts should be cautious on summary judgment to ‘ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story — the person shot dead — is unable to testify.’ ” Id. (quoting Scott v. Henrich, 39 F.3d 912, 915 (9th Cir.1994)). As the Ninth Circuit noted in Scott, 39 F.3d at 915, “the court may not simply accept what may be a self-serving account by the police officer.” Rather, *1080 “[i]t must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer’s story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.” Id. In any event, this factor highlights the district court’s ultimate conclusion that genuine fact issues remain for the jury with respect to this issue.
Because our analysis “requires careful attention to the facts and circumstances of each case,” Graham, 490 U.S. at 386, 109 S.Ct. 1865, we note that factors one and three, as set out in Estate of Larsen and reiterated in Tenorio, are particularly relevant here: “(1) whether the officers ordered the suspect to drop his weapon,” and “(3) the distance separating the officers and the suspect.” Estate of Larsen, 511 F.3d at 1260; Tenorio, 802 F.3d at 1163. The undisputed facts establish that neither Officer White nor Officer Mariscal ordered the suspect to drop his weapon. In excessive force cases, “if the suspect threatens the officer with a weapon ... deadly force may be used if necessary to prevent escape, and if where feasible, some warning has been given.” Garner, 471 U.S. at 11-12, 105 S.Ct. 1694 (emphasis added); Thomson, 584 F.3d at 1321 (citing Garner). See also Vaughan v. Cox, 343 F.3d 1323 (11th Cir.2003) (fact issue as to whether warning was feasible before deadly shot fired).
Plaintiffs’ expert witness, Glenn A. Walp, testified that in his professional opinion it was feasible for Officer White to give the suspect a warning during the five-second interval between when Samuel aimed the gun and Officer White fired his weapon, and that the officer’s failure to do so was unreasonable.[8] Aplt.App. at 289. See also id. at 286, Walp dep. at 180 (“[Bjetween the time when he saw the pointing of the weapon and what we will use for the sake of argument here today, five seconds, I feel that there was an extensive amount of time to at least yell something to the effect ... of ‘State Police, drop your weapon.’ ”). In this connection, we note that in Tenorio, within “two or three seconds ” the officer “yelled, ‘Sir, put the knife down! Put the knife down, please! Put the knife down!’ ” before he shot the decedent. 802 F.3d at 1163.
Moreover, as the circumstances in Teno-rio show, the immediacy of the danger to the police officer is important:
One could argue that [Officer] Pitzer appropriately used lethal force. The officers were responding to an emergency call for police assistance to protect against danger from a man who had *1081 been violent in the past and was waving a knife around in his home. The man was walking toward Pitzer in a moderate-sized room while still carrying the knife despite repeated orders to drop it. But the district court ruled that the record supports some potential jury findings that would establish Tenorio’s claim — in particular, that Tenorio “did not ‘refuse’ to drop the knife because he was not given sufficient time to comply’ with Pitzer’s order; that Tenorio made no hostile motions toward the officers but ivas merely “holding a small kitchen knife loosely by his thigh and ... made no threatening gestures toward anyone.”; that Tenorio was shot “before he was within striking distance of [Pit-zer] ....”
Id. at 1164-65 (emphasis added). Here, not only was Officer White fifty feet away from Samuel Pauly, Officer White was sequestered behind a rock wall and Samuel was aiming his gun through the open window of a lighted house toward a target obscured by the dark and rain.[9]
As Officer White described it when he was asked to explain what he did after he heard “We have guns,” he said he ran and took cover behind a rock wall before Samuel opened the window and stuck his gun out.
Q. And, I’m sorry, I think you just said this, but the position that you took, you know, you ran down on the other side of the rock wall. Tell me again. Were you standing? Were you crouched? What position were you in?
A. I was kneeling.
Q. So you’re kneeling, one knee up and one knee down? A. Both knees down.
Q. So both of your knees were on the ground, and where — were you looking towards the residence?
A. I was.
Q. So you kneeled down, both knees on the ground and looking over the top of the rock wall. Is that right?
A. Correct.
Q. Did you have your duty weapon drawn?
A. I did.
* * *
Q. Nobody was in the window at that point? Is that correct?
A. That’s correct.
Q. Was the window up?
A. As in closed? It was closed.
Q. Yes. So the window — both windows were closed at the point that you run down to the position in Exhibit 2?
A. Correct.
Q. You have your weapon drawn. Where is it pointing at that time?
*1082 A. It’s pointing in the direction of the house.
Q. Was it resting on the wall?
A. It was.
Aplt.App. at 222 (emphasis added). Officer White’s own description of his position at the time Samuel Pauly opened the window and pointed his gun out clearly supports the district court’s description of him as “behind a stone wall located 50 feet from the front of the house.” Id. at 680.
Officer White relies on our decision in Wilson, 52 F.3d at 1549, for the proposition that use of deadly force is reasonable where someone aims a gun at an officer. The facts there were entirely different. Officer Meeks was out in the open when he confronted Wilson, whom a witness described as “extremely drunk.” Id. Officer Meeks suspected Wilson of holding a gun concealed behind his leg and ordered him to show his hand. Wilson did not comply, and the officer repeated his demand. When Wilson brought his gun forward and Officer Meeks heard the sound, of the handgun being cocked, he shot Wilson. Id. at 1553. It is clear from the facts in Wilson that Officer Meeks was in close range of the pointed gun and that an objectively reasonable police officer would have believed his life was in immediate danger. Similarly, in Estate of Larsen, 511 F.3d at 1258, “Larsen was within 7 to 12 feet” from the officers when he raised his knife, ignored the officer’s warning to “Drop the knife or I’ll shoot,” and took a step “toward the officer.” See also Thomson, 584 F.3d at 1318 (“The time frame during which all of this happened was very short; from the time when Mr. Thomson came into view of the police until the time he was shot, possibly as few as ten seconds had elapsed. During that time, Mr. Thomson was repeatedly told to put down his weapon.... ”).
The dissent claims that “in endeavoring to affix liability on” Officer White, we stretch to distinguish Wilson, arguing that the threat to Officer White was “even more immediately compelling than those faced by the shooting officer in Wilson.” Dissent at 7. This is so, the dissent contends, because Officer White was not “fully protected” when he took cover behind a stone wall but rather “was kneeling in a vulnerable position behind a short rock wall — a wall that at most provided partial cover from the armed suspect pointing a gun at him and potentially no cover from the second armed suspect whose exact location outside was unknown.” Dissent at 7 n. 5. But as we have already noted, the dissent’s claim completely ignores the long standing rule that we must view the evidence in the light most favorable to plaintiff estate, and that “reasonable inferences should be drawn in favor of the nonmoving party.” Tolan, 134 S.Ct. at 1868. Instead, the dissent assumes facts in the light most favorable to Officer White. The dissent’s reliance on Wilson4s accordingly flawed.
Based on the record in the present ease, viewed in plaintiff estate’s favor, we agree with the district court that a jury could find a reasonable officer in Officer White’s position would not have probable cause to believe there was an immediate threat of serious harm to himself or to Officer Mar-iscal, who was also behind cover, such that he could shoot Samuel Pauly through the window of his home without giving him a warning. As a result, the jury could conclude Officer White’s use of deadly force against Samuel Pauly was not objectively reasonable and violated the Fourth Amendment.
2. Clearly Established
Having held that the evidence is sufficient to establish an excessive force claim, we turn to whether the law was clearly established at the time of the violation. *1083 “The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Saucier, 533 U.S. at 207, 121 S.Ct. 2151; Casey, 509 F.3d at 1283-84.
Graham, 490 U.S. at 396, 109 S.Ct. 1865, and its Tenth Circuit progeny, including our 1997 decision in Allen, clearly established that the reasonableness of an officer’s use of force depends, in part, on “whether the officer[ ] [was] in danger at the precise moment that [he] used force.” Allen, 119 F.3d at 840 (quoting Sevier, 60 F.3d at 699). In addition, since 1985 and the Supreme Court’s decision in Gamer, it has been clearly established that “if the suspect threatens the officer with a weapon ... deadly force may be used if necessary to prevent escape, and if where feasible, some warning has been given. 471 U.S. at 11-12, 105 S.Ct. 1694 (emphasis added); see also Vaughan, 343 F.3d at 1331 (fact issue as to whether warning was feasible before deadly shot fired).
The dissent argues that by relying on Graham and Allen, we violate the Supreme Court’s instruction not to define clearly established law too generally. Dissent at 11. It is true that in Mullenix, the Court stated that it has “repeatedly told courts ... not to define clearly established law at a high level of generality.” 136 S.Ct. at 308 (quoting al-Kidd, 563 U.S. at 742, 131 S.Ct. 2074). But the central question, the Court noted, is “whether the vio-lative nature of particular conduct is clearly established.” Id. (quoting al-Kidd, 563 U.S. at 742, 131 S.Ct. 2074). In reversing the Fifth Circuit’s clearly established law analysis “that a police officer may not use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others,” the Court explained that it had “previously considered — and rejected — almost that exact formulation of the qualified immunity question ... [i]n Brosseau [v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)].” Id. at 308-09, 125 S.Ct. 596 (internal citation and quotation marks omitted). Mulle-nix is thus distinguishable from this case because there were clearly other cases on point there that had rejected the argument used to form the basis of the Fifth Circuit’s decision.
Notably, in Brosseau, 543 U.S. at 199, 125 S.Ct. 596, a case decided in 2004, the Court reversed the Ninth Circuit’s denial of qualified immunity, holding that using the “general” test for excessive force cases from Garner, 471 U.S. at 85, 105 S.Ct. 1694, was “mistaken.” The Court explained that the Ninth Circuit erred in finding “fair warning in the general tests set out in Graham and Gamer,” because “Graham and Gamer, following the lead of the Fourth Amendment’s text, are cast at a high level of generality.” Id. at 199, 125 S.Ct. 596. Rather, the Court explained that the relevant inquiry was whether it was clearly established the officer’s conduct was prohibited by the Fourth Amendment in the specific “situation [Brosseau] confronted.” Id. at 199-200, 125 S.Ct. 596. Most significantly, the Court cited Hope, 536 U.S. at 738, 122 S.Ct. 2508, for the proposition that “of course, in an obvious case, [the Gamer and Graham ] standards can ‘clearly establish’ the answer, even without a body of relevant case law.” Id. at 199, 125 S.Ct. 596. Nothing in Mullinex overruled Hope on this point.
Building on the Court’s decision in Hope, our decision in Casey decided almost three years after Brosseau, explained that “[t]he Hope decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice *1084 that the described conduct was unconstitutional.” 509 F.3d at 1284, (internal quotation marks omitted). We explained that “[w]e therefore adopted a sliding scale to determine when law is clearly established, id,., stating that “[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.” Id. (quoting Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir.2004)).
Taking, the facts as the district court determined them in the light most favorable to plaintiff estate, we are presented with this situation: an officer outside someone’s home in the dark of night with no probable cause to arrest anyone and behind the cover of a wall 50 feet away from a possible threat, with no warning shot a man pointing his gun out of his well-lighted window at an unknown person in his yard while the man’s brother fired protective shots in the air from behind the house. Given his cover, the distance from the window, and the darkness, a reasonable jury could find that Officer White was not in immediate fear for his safety or the safety of others. Any objectively reasonable officer in this position would well know that a homeowner has the right to protect his home against intruders and that the officer has no right to immediately use deadly force in these circumstances. Based on our sliding scale test established in Casey, 509 F.3d at 1284, we do not. agree with the dissent that more specificity is required to put an objectively reasonable officer on fair notice.
Accordingly, accepting as true plaintiff estate’s'version of the facts, a reasonable officer in Officer White’s position should have understood, based on clearly established law, that (1) he was not entitled to use deadly force unless he was in danger at the exact moment of the threat of force and (2) he was required, under the circumstances here, to warn Mr. Pauly to drop his weapon.
Y
Conclusion
We AFFIRM the district court’s denial of summary judgment.

. The father also asserted state law claims for negligent training (Count Two), wrongful death under the New Mexico Tort Claims Act (Count Three), and violation of New Mexico Constitution, art. II, § 10 (Count Four). Samuel Pauly’s brother, Daniel Pauly, asserted a claim for loss of consortium (Count Five). The parties stipulated to dismissal of Count Two. Only the excessive force claim is at issue in this appeal.

. The district court’s recitation of the facts is identical in the order denying qualified immunity to Officers Mariscal and Truesdale and the separate order denying qualified immunity to Officer White. We therefore cite primarily to the latter order when setting out the facts.

. Officer White testified in his deposition that after he heard the shots at the back of the house, "I believed Officer Truesdale had been shot at that point, being that I believed he was at the rear of the residence.” Aplt.App. at 223, White dep. at 137. He also admitted, however, that '1 did not hear anything that would suggest a person had been hit.” Id., White dep. at 139.

. "Deadly force is ‘force that the actor uses with the purpose of causing or that he knows to create a substantial risk of causing death or serious bodily harm. Purposefully firing a firearm in the direction of another person ... constitutes deadly force.'" Jiron v. City of Lakewood, 392 F.3d 410, 415 n. 2 (10th Cir.2004) (quoting Ryder v. City of Topeka, 814 F.2d 1412, 1416 n. 11 (10th Cir.1987)).

. In United States v. Jerez, 108 F.3d 684, 690 (7th Cir.1997), the Seventh Circuit explained that its "jurisprudence interpreting the Fourth Amendment has long recognized that police encounters at a person's dwelling in the middle of the night are especially intrusive,” and that "when a knock at the door comes in-the dead of night, the nature and effect of the intrusion into the privacy of the dwelling must be examined with the greatest of caution.”

. We have also considered situations in which plaintiffs have alleged that an officer, by failing to take cover, created the exigency requiring use of force. See Medina, 252 F.3d at 1132; Quezada v. Cty. of Bernalillo, 944 F.2d 710, 717 (10th Cir.1991). We concluded that officers are not required to take cover when they are faced with a deadly threat. Here, however, Officers White and Mariscal did *1077 take cover, before they were faced with any imminent harm.

. Under New Mexico law, reckless driving and driving while intoxicated (first offense) are misdemeanor offenses. State v. Trevizo, 150 N.M. 158, 257 P.3d 978, 982 (Ct.App. 2011) (citing N.M. Stat. Ann. § 66-8-113(B) (1978) (reckless driving); § 668-102(E)(DWI)) (holding that one-year statute of limitations for petty misdemeanors applied to the defendant's DWI and reckless driving charges).

. The dissent criticizes our use of Mr. Walp’s testimony, noting that "we’ve previously discounted the use of expert testimony to undermine the reasonableness of an officer’s on-scene judgment and we should do the same here,” citing Thomson, 584 F.3d at 1320-21, and Saucier, 533 U.S. at 194 n. 6, 121 S.Ct. 2151. Dissent at 1088. In essence, the dissent views our use of the expert testimony as the type of second guessing and 20/20 hindsight the Supreme Court has instructed is not appropriate when reviewing the reasonableness of an officer’s conduct. See Graham, 490 U.S. at 396, 109 S.Ct. 1865 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.”). However, we mention his testimony only because it supports the district court's determination that a reasonable jury could conclude it was feasible for Officer White to warn Samuel Pauly before shooting him, especially where he was behind cover before Samuel opened the window. A jury may accept this testimony, but it may not. But Mr. Walp’s testimony highlights why a reasonable jury might conclude it was feasible. In any event, we have not found a bright line rule precluding us from mentioning expert testimony in the record on a subject on which the district court found genuine fact disputes remain. See Aplt.App. at 684-85 ("For example, it is disputed whether ... it was feasible for Officer White to warn Samuel Pauly before shooting him.”).

. We disagree with the dissent’s characterization of Officer White's position when he took cover as behind a "partial rock wall.” Dissent at 1087 n. 4, 1088. By implying that Officer White was not in a protected position when Samuel Pauly pointed the gun in his direction, the dissent does not read the evidence in the light most favorable to plaintiff estate and fails to rely on the district court’s determination of the evidence. The dissent ignores the "fundamental principle” that in reviewing the denial of a summary judgment motion based on qualified immunity, "reasonable inferences should be drawn in favor of the nonmoving party.” Tolan v. Cotton, - U.S. -, 134 S.Ct. 1861, 1868, 188 L.Ed.2d 895 (2014) (reversing grant of summary judgment to Officer and holding the “court below credited evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion”); accord Weigel, 544 F.3d at 1147 ("In reciting the facts of this case, we view the evidence in the light most favorable to the non-moving party.”). The dissent clearly reads the evidence concerning the cover of his position in the light most favorable to Officer White and impermissibly draws inferences in his favor.