2008-NMSC-030

185 P.3d 355

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Cecil BOYETT, Defendant–Appellant.**

No. 29,730.

Supreme Court of New Mexico.

April 28, 2008.

John Bigelow, Chief Public Defender, Sheila Lewis, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

Gary K. King, Attorney General, Jacqueline R. Medina, Assistant Attorney General, Santa Fe, NM, for Appellee.

## OPINION

·SERNA, Justice.

{1} Defendant Cecil Boyett appeals from his conviction for the first degree murder of Deborah Rhodes (Victim), contrary to NMSA 1978, Section 30–2–1(A) (1963, as amended through 1994). He alleges that the trial court erred in refusing to instruct the jury on his theory of the case and in denying his motion for a new trial. We discern no error and affirm Defendant's conviction.

## I. BACKGROUND

{2} Defendant and Victim had a rancorous history. The enmity that each harbored for the other apparently had its roots in a romantic interest that both had in Renate Wilder (Wilder).

{3} Wilder and Victim were childhood friends who eventually moved in together and started an intimate relationship. Although their romance ended, the two remained close friends, living and working together. Wilder later met Defendant, and the two became romantically involved. Wilder eventually supplanted Victim's presence in her life with that of Defendant. She fired Victim from her bar and gave Victim's former job to Defendant. She ousted Victim from her home with the help of a restraining order and invited Defendant to move in. At one point, Victim discovered the entwined couple near the hot tub behind Wilder's house. Enraged, Victim retrieved a gun from the house and used it to threaten the couple. Disdain developed between Defendant and Victim, and Victim only occasionally returned to Wilder's home after she was forced out.

{4} Following a protracted courtship, Wilder and Defendant planned to marry on February 6, 2004. A few days prior to her wedding, Wilder absconded from the home that she shared with Defendant. She spent that time with Victim and did not tell Defendant where she was or what she was doing. Wondering as to her whereabouts, Defendant engaged in a variety of activities aimed at locating her but was unsuccessful in his attempts; he rightfully suspected that she was with Victim although he was unable, at that time, to confirm his suspicions.

{5} On the afternoon of February 5, 2004, Wilder departed Victim's company to return to her own home but had a car accident along the way. The accident occurred near Victim's residence and, for a variety of reasons, Victim offered to claim responsibility for it. Wilder accepted and departed the scene on foot, walking back to the house that she shared with Defendant. Shortly after Wilder returned to the house, Victim arrived. Victim's visit concluded when Defendant shot her in the head with a .357 revolver from approximately four feet away, but the events leading to that end were disputed at trial.

{6} The State successfully argued to the jury that Defendant hated Victim, was furious with her for having kept Wilder away without telling him about it, and shot her that afternoon to put an end to her meddling in the couple's affairs. The State theorized that Victim went to the house to return Wilder's keys and makeup bag, which she had forgotten in the wrecked car. The State argued that before Victim could accomplish that goal, Defendant opened the front door, shouted at her to leave the property, and then immediately shot her.

{7} Defendant's version of events was quite different. He claimed that Victim came to the house that day intent on killing him to prevent his impending marriage to Wilder. Defendant testified that he heard a loud banging at the front door, grabbed the gun that he kept nearby, and opened the door only to find a furious Victim on the doorstep. Defendant said that he shouted at Victim, telling her to get off his property, but in the process of trying to run her off, he observed her draw the gun that he knew she routinely carried. In fear for his life, Defendant raised his revolver and shot Victim. Defendant asserted that if he had not shot her, she would have fired her gun and fatally wounded him.

{8} Defendant had two theories of the case. First, he argued that he was not guilty because he acted lawfully in shooting Victim, either in self defense, defense of another, or defense of habitation. Second, he argued that he was not guilty because he was unable to form the specific intent necessary to commit first degree murder. To establish his theory that he lacked specific intent, Defendant filed a Notice of Incapacity to Form Specific Intent (Notice) with the trial court. Although his Notice listed three expert witnesses who could have testified in support of the defense, Defendant did not produce an expert witness at trial. The expert that Defendant expected to testify regarding his specific intent, Dr. Lori Martinez, withdrew on the eve of her scheduled testimony after receiving police reports and other records from the State. Defendant did not offer testimony from the other experts listed in his Notice, nor did he

seek a continuance to procure such testimony.

{9} Defendant requested that the jury be instructed on both theories. The trial court concluded that the jury instruction related to defense of habitation, UJI 14–5170 NMRA, did not apply in this case because Defendant did not shoot Victim inside his home. The trial court denied Defendant's instruction on inability to form specific intent, UJI 14–5110 NMRA, because it required expert testimony and none had been provided. Based on the instructions that it was given, the jury convicted Defendant of first degree murder.

{10} After the verdict, Defendant filed a motion for a new trial. He alleged that he was surprised by Dr. Martinez's withdrawal and was unable to replace her when she refused to testify. Defendant also contended that the State had intimidated Dr. Martinez by providing her with the previously unseen reports and statements. Defendant argued that he was "without the ability to obtain another expert to testify to [the specific intent] matter," and thus he should be granted a new trial in which he could offer such expert testimony. The trial court denied Defendant's motion for a new trial and sentenced him to life in prison.

{11} Defendant is now before this Court on direct appeal. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of . . . life imprisonment shall be taken directly to the supreme court."); *accord* Rule 12–102(A)(1) NMRA. He challenges the trial court's refusal to instruct the jury on defense of habitation and inability to form specific intent, as well as its denial of his motion for a new trial. Concluding that the trial court made the proper ruling on those issues, we affirm Defendant's conviction. We write to clarify the law governing defense of habitation and to elucidate the evidentiary requirement for a jury instruction on inability to form specific intent.

## II. DEFENDANT WAS NOT ENTITLED TO THE REQUESTED JURY INSTRUCTIONS

### A. Standard of Review

{12} "The propriety of denying a jury instruction is a mixed question of law and fact that we review de novo." *State v. Gaines,* 2001–NMSC–036, ¶ 4, 131 N.M. 347, 36 P.3d 438. A defendant is entitled to an instruction on his or her theory of the case if evidence has been presented that is "sufficient to allow reasonable minds to differ as to all elements of the offense." *State v. Gonzales,* 2007–NMSC–059, ¶ 19, 143 N.M. 25, 172 P.3d 162. "When considering a defendant's requested instructions, we view the evidence in the light most favorable to the giving of the requested instruction[s]." *State v. Contreras,* 2007–NMCA–119, ¶ 8, 142 N.M. 518, 167 P.3d 966 (alternation in original) (quoted authority omitted). Failure to instruct the jury on a defendant's theory of the case is reversible error only if the evidence at trial supported giving the instruction. *See State v. Gardner,* 85 N.M. 104, 107, 509 P.2d 871, 874 (1973) ("[T]he court need not instruct if there is absence of such evidence.").

{13} We address Defendant's claim to each of the requested instructions in turn.

### B. Defense of Habitation

{14} The trial court denied the defense of habitation instruction based on its conclusion that the defense applies to only those situations in which an intruder is killed within the home. Picking up the torch lit by the trial court, the State now argues that the defense should be limited to situations in which a person forcibly enters a home and is killed while intruding therein. By that argument, the State seeks our endorsement of a bright line rule that would require an intruder to cross the threshold before an occupant's use of force to repel that entry could be justified by defense of habitation. Despite the State's contention, we are unwilling to draw such a bright line.

{15} Defense of habitation has long been recognized in New Mexico. *See, e.g., State v. Bailey,* 27 N.M. 145, 162–63, 198 P. 529, 534 (1921). It gives a person the right to use lethal force against an intruder when such force is necessary to prevent the commission of a felony in his or her home. *Id.* at 162, 198 P. at 534; *see also* UJI 14–5170.

The defense is grounded in the theory that "[t]he home is one of the most important institutions of the state, and has ever been regarded as a place where a person has a right to stand his [or her] ground and repel, force by force, to the extent necessary for its protection." *State v. Couch*, 52 N.M. 127, 134, 193 P.2d 405, 409 (1946) (quoted authority omitted). Ultimately, in every purported defense of habitation, the use of deadly force is justified only if the defendant reasonably believed that the commission of a felony in his or her home was immediately at hand and that it was necessary to kill the intruder to prevent that occurrence. *Id.* at 133–34, 193 P.2d at 409; *see also* UJI 14–5170.

{16} This Court has refused to extend the defense to situations in which the victim was fleeing from the defendant, *Gonzales*, 2007–NMSC–059, ¶ 22, 143 N.M. 25, 172 P.3d 162, as well as situations in which the victim had lawfully entered the defendant's home, *see State v. Abeyta*, 120 N.M. 233, 244, 901 P.2d 164, 175 (1995) (*abrogated on other grounds by State v. Campos*, 1996–NMSC–043, 122 N.M. 148, 921 P.2d 1266). But our courts have never held that entry into the defendant's home is a prerequisite for the defense. On the contrary, the seminal New Mexico case on defense of habitation was clear that, in certain circumstances, it may justify an occupant's use of lethal force against an intruder who is outside the home. *Bailey*, 27 N.M. at 162, 198 P. at 534.

{17} In addition to providing a defense for the killing of an intruder already inside the defendant's home, *Bailey* explained that defense of habitation justifies killing an intruder who is assaulting the defendant's home with the intent of reaching its occupants and committing a felony against them. *Id.* Protecting a defendant's right to prevent forced entry necessitates that the defense apply when an intruder is outside the home but endeavoring to enter it. *See id.* This interpretation of defense of habitation is supported by *Couch*, where the defendant fired a shotgun from within his home at an intruder who was outside, pelting the home with rocks. 52 N.M. at 130, 193 P.2d at 406. Prior to the night of the shooting, the defendant's home had repeatedly been broken into, which caused he and his wife to "suffer intensely from apprehension of violence at the hands of the unknown intruder." *Id.* at 130, 139, 193 P.2d at 406, 412. When the later assault on their home occurred, both the defendant and his wife believed that the attackers were the same people who had previously broken in. *Id.* at 139, 193 P.2d at 412. This Court concluded that, even though the victim was killed outside the home, the defendant was entitled to an instruction on defense of habitation because he could reasonably have believed that the person attacking it intended to enter and commit violence against the occupants. *See id.* at 140, 145, 193 P.2d at 412–13, 416.

{18} The proposition that defense of habitation allows one to kill to prevent an intruder's forced entry is well supported by the law in other jurisdictions and treatises on the subject. *See, e.g., People v. Curtis*, 30 Cal. App.4th 1337, 37 Cal.Rptr.2d 304, 318 (Ct. App.1994) ("Defense of habitation applies where the defendant uses reasonable force to exclude someone he or she reasonably believes is trespassing in, *or about to trespass in*, his or her home." (emphasis added)); *State v. Avery*, 120 S.W.3d 196, 204 (Mo. 2003) (en banc) ("[D]efense of premises . . . authorizes protective acts to be taken . . . at the time when and place where the intruder is *seeking to cross the protective barrier* of the house." (emphasis added) (quoted authority omitted)); *State v. Blue*, 356 N.C. 79, 565 S.E.2d 133, 139 (2002) ("[U]nder the defense of habitation, the defendant's use of force . . . would be justified *to prevent the victim's entry* . . . ." (emphasis added)); *State v. Rye*, 375 S.C. 119, 651 S.E.2d 321, 323 (2007) ("[T]he defense of habitation provides that where one *attempts to force himself into another's dwelling*, the law permits an owner to use reasonable force to expel the trespasser." (emphasis added)); *see also* 40 C.J.S. *Homicide* § 164 (2006) ("People may defend their dwellings against those who *endeavor by violence to enter them* and who appear to intend violence to persons inside . . . ." (emphasis added)); 2 Wharton's Criminal Law § 131 (15th ed. 1994) ("When a dwelling house is entered or *attempted to be entered by force* . . . the occupant may use deadly

force, if reasonably necessary, to prevent or terminate such entry." (emphasis added)).

{19} Based on our precedent and the authorities cited above, we cannot accept the position that defense of habitation requires an intruder to cross the threshold of the defendant's home. Instead, we emphasize that a person has a right to defend his or her residence not only when an intruder is already inside the home, but also when an intruder is outside the home and attempting to enter to commit a violent felony. *Bailey*, 27 N.M. at 162, 198 P. at 534.

{20} We recognize that "[t]he term felony in former times carried a connotation of greater threat than" it does today. *State v. Pellegrino*, 577 N.W.2d 590, 596 (S.D.1998). "In the common law, the rule developed that use of lethal force to prevent a felony was only justified if the felony was a forcible and atrocious crime." *Id.* (quoted authority omitted). Felonies are no longer constrained to forcible and atrocious crimes, and were we not to update *Bailey's* "felony" language, defense of habitation may apply to situations in which an intruder attempts to force entry into a home with the purpose of committing a non-violent felony, such as bribing a public official therein. *See* NMSA 1978, § 30–24–1 (1963) (bribing a public official is a third degree felony). Seeking to avoid such absurdity, we turn to our prior decisions to determine the meaning of "felony" as it is used in the defense of habitation context.

{21} As noted above, the defendant in *Couch* was entitled to an instruction on defense of habitation because he could have reasonably believed that the people who were attacking his home intended violence against its occupants. *See* 52 N.M. at 140, 193 P.2d at 412–13. Later, in *Abeyta*, this Court held that the defendant did not qualify for a defense of habitation instruction because, among other things, no evidence had been presented that the victim "enter[ed] the house in order to commit a felony involving violence." 120 N.M. at 244, 901 P.2d at 175. Those authorities show that the term "felony" in the defense of habitation context is properly limited to those felonies involving violence. In other words, the felony that the defendant acted to prevent must have been

one that would have resulted in violence against the occupants were it not prevented; in the event of any other felony, a defense of habitation instruction would be unwarranted. *See Bailey*, 27 N.M. at 162–63, 198 P. at 534 ("[I]t is not true that a [person] may kill another in his [or her] house when under the same circumstances of danger, or apparent danger, to person or property, he [or she] would not be justified in killing outside [the] house."); *see also Pellegrino*, 577 N.W.2d at 596 ("[P]eople may defend their dwellings against those who endeavor by violence to enter them and who appear to intend violence to persons inside.").

{22} Because defense of habitation is not restricted to instances in which the victim is killed inside the defendant's home, the trial court in this case erred when it excluded the instruction on that ground. Defendant would have been entitled to an instruction on the defense if some evidence reasonably tended to show that he killed Victim to prevent her from forcing entry into his home and committing a violent felony once inside. Thus, the question we must now answer is whether, when viewed in the light most favorable to giving the instruction, the evidence supports that theory. We decide that it does not.

{23} Defendant asserts that the following evidence is enough to support his theory that he had a reasonable belief that killing Victim was necessary to prevent a felony from occurring within his home: (1) Victim hated Defendant; (2) she knocked on the door to Defendant's home; (3) she had threatened him with a gun in the past; (4) she was furious that the couple was to be married the next day; and (5) she always carried a loaded gun. Absent from that evidence is any demonstration that Victim was "endeavor[ing] by violence to enter" his home or that she "intend[ed] violence to persons inside." 40 C.J.S. *Homicide* § 164. Assuming that Defendant reasonably believed that Victim intended to commit a felony in his home, defense of habitation would have justified his actions only if he could show that Victim was attempting to force entry to his home. For example, if the evidence showed that Victim was trying to break through De-

fendant's front door at the time he killed her, defense of habitation would apply. However, under the facts of this case, there is no evidence reasonably tending to support the theory that Victim was attempting to force entry at the time Defendant killed her. After knocking on the door, Victim had retreated some four feet from it and was waiting for it to open. No evidence shows that, at the time she was killed, Victim was attempting to gain entry to Defendant's home with the intent to commit a violent felony therein.

{24} Defendant's argument seems to assert that he should have received the instruction because he could have reasonably believed that Victim was going to shoot him and then enter his home to continue the shooting. While that theory justifies the instructions that Defendant received on self defense, see UJI 14–5171 NMRA, and defense of another, see UJI 14–5172 NMRA, it does not give rise to an instruction on defense of habitation because it does not allege any attempted forced entry on Victim's part.

{25} Because there is no evidence to support the theory that Defendant killed Victim in defense of his habitation, refusing the instruction was not in error. Although the trial court erred in its reasons for denying the instruction, the end result of its ruling was correct, and thus we affirm. See Meiboom v. Watson, 2000–NMSC–004, ¶ 20, 128 N.M. 536, 994 P.2d 1154 ("[E]ven if the district court offered erroneous rationale for its decision, it will be affirmed if right for any reason.").

## C. Inability to Form Specific Intent

{26} At trial, Defendant theorized that the organic brain damage he suffered years earlier caused him some mental disease or disorder that made him incapable of forming the requisite intent for first degree murder. He did not offer expert witness testimony to support his theory, and, based on the absence of such testimony, the trial court refused to instruct the jury on that theory. Defendant now challenges that ruling, alleging that the instruction does not require expert testimony, and therefore that the trial court erred in denying the instruction.

{27} The defense of inability to form specific intent allows a defendant to avoid culpability for willful and deliberate murder whenever he or she was unable to form the specific intent required to commit the crime. See State v. Padilla, 66 N.M. 289, 295, 347 P.2d 312, 316 (1959); see also UJI 14–5110. The defense requires "evidence of the condition of the mind of the accused at the time of the crime, together with the surrounding circumstances, . . . to prove that the situation was such that" the defendant was unable to form specific intent, and thus lacked "any deliberate or premeditated design." Padilla, 66 N.M. at 295, 347 P.2d at 316 (emphasis and quoted authority omitted). It applies in two situations: (1) when the defendant was intoxicated from the use of alcohol or drugs and (2) when the defendant suffered from a mental disease or disorder. Id.; see also UJI 14–5110. It is the latter that concerns us in this case.

{28} This Court has previously recognized that expert testimony is not required when the alleged cause of the defendant's inability to form specific intent is within the realm of common knowledge and experience. See State v. Privett, 104 N.M. 79, 82, 717 P.2d 55, 58 (1986) (holding that expert testimony is not required for jury to understand how defendant's intoxication may have interfered with his ability to form specific intent because "lay [persons] are capable of assessing the effects of intoxication as a matter within their common knowledge and experience"). Our Court of Appeals has explained that to establish an inability to form specific intent defense, the "defendant ha[s] the burden of introducing at least some competent evidence to support his [or her] claim" and "even the opinion testimony of nonexperts [can] provide the necessary competent evidence." State v. Najar, 104 N.M. 540, 543, 724 P.2d 249, 252 (Ct.App.1986). Thus, Defendant is correct insofar as he argues that the inability to form specific intent instruction does not require expert testimony, per se. However, Defendant errs by contending that nonexpert testimony will always suffice. When understanding the purported cause of a defendant's inability to form specific intent goes beyond common knowledge and experience and requires scientific or specialized

knowledge, lay witnesses are not qualified to testify and expert testimony is required.[1] *Cf. State v. Day,* 2008–NMSC–007, ¶ 31, 143 N.M. 359, 176 P.3d 1091 (requiring scientific retrograde extrapolation evidence to prove defendant's earlier BAC based on later-obtained BAC test results because lay witness testimony regarding behavioral evidence is insufficient).

{29} In this case, Defendant argued that his organic brain damage caused his inability to form specific intent. In many cases, such a connection between a defendant's medical condition and its effect on his or her ability to form specific intent will have to be established by expert testimony because the question often involves complicated medical issues that are beyond the realm of common knowledge and experience. The trial court viewed this case as one in which expert testimony was necessary to link Defendant's injury to his inability to form the requisite intent, and Defendant has not persuaded us that the trial court was wrong in that conclusion.

{30} Although Defendant contends that his prior nursing experience qualified him as an expert capable of testifying about the cause of his inability to form specific intent, Defendant was never qualified as an expert at trial, and, regardless of whether he could have been so qualified, his testimony about his injury did not establish its effect on his capacity to form specific intent. When an inability to form specific intent defense is based on a mental disease or disorder, an instruction "is proper only when there is evidence that reasonably tends to show that the defendant's claimed mental disease or disorder rendered the defendant incapable of forming specific intent at the time of the offense." *State v. Balderama,* 2004–NMSC–008, ¶ 38, 135 N.M. 329, 88 P.3d 845. The only evidence that Defendant presented linking his organic brain damage to his inability to form specific intent was his own testimony regarding his injury. Defendant testified in

detail about a head injury that he had suffered; that he had organic brain damage; that he had problems with amnesia; that he underwent various therapies to recover from his brain injury; that he had been on several different medications; and that his friends sometimes thought he "was out in left field." Neither Defendant nor any other witness testified about how those facts showed that he was unable to form the requisite intent at the time of the offense, and thus the evidence did not reasonably tend to show that Defendant was unable to form specific intent at the time of the murder. Therefore, we hold that the trial court properly refused to instruct the jury on inability to form specific intent.

## III. THE TRIAL COURT PROPERLY DENIED DEFENDANT'S MOTION FOR A NEW TRIAL

{31} Finally, Defendant argues that the trial court erred in refusing to grant him a new trial so that he could present expert witness testimony regarding his inability to form a specific intent defense. We review for abuse of discretion. *State v. Chavez,* 98 N.M. 682, 684, 652 P.2d 232, 234 (1982).

{32} Defendant argues that the absence of expert testimony concerning his inability to form specific intent resulted in prejudicial error, and thus he is entitled to a new trial. In so doing, he relies heavily on *Balderama,* in which the trial court excluded expert witness testimony about the defendant's ability to form specific intent. 2004–NMSC–008, ¶ 18, 135 N.M. 329, 88 P.3d 845. This Court held that excluding the evidence constituted reversible error. *Id.* ¶ 2. Analogizing his case to *Balderama,* Defendant claims in his reply brief that "[t]he only difference between the cases is the reason why the expert could not testify." Defendant's reliance *Balderama* misses the mark. In *Balderama,* the trial court excluded the expert testimony. *Id.* In the instant case, Defendant's expert witness refused to testify on her own accord, and Defendant did not mitigate the loss by

---

1. We note that this aspect of our case law has been adopted into New Mexico's Rules of Evidence by the 2006 amendment to Rule 11–701 NMRA, which had not occurred at the time of Defendant's trial. At that time, the rule was changed to explicitly prevent lay witnesses from offering opinion testimony that is "based on scientific, technical or other specialized knowledge within the scope of [the rule governing testimony by experts]." Rule 11–701(C).

subpoenaing her or moving for a continuance to secure a replacement expert.

{33} The facts of this case more closely resemble those in *State v. Torres*, in which this Court granted the defendant a new trial because one of his witnesses failed to testify. 1999–NMSC–010, ¶¶ 1, 6, 9, 127 N.M. 20, 976 P.2d 20. In *Torres*, when the defendant's witness did not appear despite having been subpoenaed, he moved for a continuance. *Id.* ¶ 6. The trial court denied that continuance, which this Court held to be reversible error. *Id.* ¶ 9. The distinguishing factor between the instant case and *Torres* is that the defendant in *Torres* moved for a continuance due to the witness's absence, whereas here Defendant simply proceeded with trial. After Dr. Martinez refused to testify, Defendant never subpoenaed her or any other expert to testify about his inability to form specific intent, nor did he move for a continuance to secure such testimony.

{34} The record shows that Defendant was on notice that Dr. Martinez might change her opinion in light of the material that the State planned to provide her and that she would not "testify on limited information." Dr. Martinez also advised the parties that it would be wise to obtain another expert's opinion about Defendant's inability to form specific intent, and Defendant had named two other experts on his pretrial Notice that he could have called to testify on the matter. Once he became aware that Dr. Martinez would not testify, Defendant could have moved for a continuance to secure testimony from another expert and *Torres* would have supported that motion. *See id.* ¶ 9. However, Defendant chose not to do so.

{35} Furthermore, during the hearing on his motion for a new trial, Defendant merely speculated that he could have found an expert willing to testify about his inability to form specific intent. He did not submit a written diagnosis or evaluation supporting his inability to form specific intent claim, nor did he offer an expert's testimony or affidavit to that effect. Ultimately, as the State points out, Defendant presented no expert testimony to support his inability to form specific intent claim because he did not pursue the options available to him by which he could have obtained such testimony. And, equally important, Defendant has never demonstrated that, with sufficient time, he could have presented an expert to testify about his diminished capacity. Therefore, we are left to speculate about any prejudice to Defendant caused by his counsel's decision not to request a continuance.

{36} We conclude that the trial court did not abuse its discretion in denying the motion for a new trial, and we will not disturb its ruling.

## IV. CONCLUSION

{37} Based on the forgoing analysis, we affirm Defendant's conviction.

{38} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, RICHARD C. BOSSON, Justice, and RICHARD E. RANSOM (Pro Tem).