This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date:   March 24, 2016**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                      **NO. S-1-SC-34944**

**PAUL N. REYNOLDS,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**Jerry H. Ritter, Jr., District Judge**

Jorge A. Alvarado, Chief Public Defender
David C. Henderson, Assistant Appellate Defender
Santa Fe, NM

for Appellant


Hector H. Balderas, Attorney General
Jacqueline R. Medina, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**VIGIL, Chief Justice.**

{1}    Defendant Paul Reynolds pled no contest to first-degree murder, unlawful taking of a motor vehicle, and tampering with evidence, pursuant to a plea agreement. Defendant now argues that he should be allowed to withdraw that plea because it was not knowing, intelligent, and voluntary due to the ineffective assistance of his plea counsel. Specifically, Defendant contends that his attorneys were ineffective because they failed to investigate and advise him of potential defenses based on a lack of specific intent or insanity, and that had he been so advised, he would not have entered the plea. The Twelfth Judicial District Court denied Defendant's motion to withdraw his plea, and we hold that the district court did not abuse its discretion in so doing. Because established New Mexico law resolves the issues raised by Defendant, we issue our ruling in this case by this non-precedential decision. *See* Rule 12-405(B)(1) NMRA.

**I.    BACKGROUND**

**A.    Facts Supporting Defendant's Charges**

{2}    Defendant's charges arose from a series of events in which Rita Gallegos was killed in her home in Tularosa, New Mexico, on January 1, 2013. Based on its investigation of the case, the State presented the following factual theory in support

of the charges.

{3} Rita and her husband Albert Gallegos met and befriended Defendant, who was a teenager with a difficult home life. As part of his employment with a transport company, Mr. Gallegos transported Defendant from Tularosa to Albuquerque for medical appointments. At times, the Gallegoses would feed Defendant and allow him to stay in their home when he got kicked out of his own house.

{4} As of January 1, 2013, Defendant had been staying with a friend in Tularosa. Also staying there were two women who told Defendant that they wanted to go to Las Cruces but had no way to get there. Remembering that Mr. Gallegos had an older muscle car, Defendant told the women that he knew where they could get a car and that he would take them to Las Cruces.

{5} Defendant and the two women went to a Dollar General Store where they stole duct tape and a knife. They then walked to the Gallegoses' home. The women waited outside near the street while Defendant went to talk to Mr. Gallegos under the ruse that Defendant was interested in purchasing some stereo equipment, when really he was just trying to verify that Mr. Gallegos still had the old muscle car Defendant planned to steal. Mr. Gallegos invited Defendant inside the house, where the two talked briefly, and then Defendant left to meet his companions who were still waiting

3

outside.

{6}    After walking down the street with the two women, Defendant instructed them to wait for him and he returned to the Gallegos home by himself. Mr. Gallegos was out delivering some food to a family friend, so Mrs. Gallegos was there alone. Defendant entered the home, armed with a box cutter, where he found Mrs. Gallegos in the kitchen. Defendant attacked Mrs. Gallegos, cutting her with the box cutter and stabbing her multiple times with a pair of scissors and a large barbeque fork. The attack ended in Mrs. Gallegos's bedroom, where she ultimately died of the injuries. Defendant then searched the house for the keys to the muscle car, but when he could not find them, he chose instead to steal Mrs. Gallegos's SUV. Defendant drove the SUV to pick up the two women who were waiting a short distance away. One of the women later told officers that she observed blood on Defendant's face and clothing. She also said Defendant told her he had done something bad and was sorry.

{7}    Mr. Gallegos returned home and saw that Mrs. Gallegos's vehicle was missing from the driveway. When he went inside the home he saw a large pool of blood on the floor of the kitchen but could not find his wife. Mr. Gallegos called the authorities to report his wife and her vehicle missing. Investigators arrived on scene and located his wife's body in the bedroom. They concluded that Mrs. Gallegos had died from the

multiple stab wounds and lacerations on various parts of her body.

{8} Meanwhile, Defendant drove the SUV with his two passengers away from the scene. As Defendant drove away from the Gallegos home, he lost control of the vehicle and rolled it over on a highway in Alamogordo. The three attempted to flee the scene of the accident on foot, but the two women were apprehended by law enforcement. Defendant fled and went to Wal-Mart where he shoplifted supplies so he could hide out in the mountains to evade police. That evening, Defendant called his father and told him that he had done something really bad and would be going to prison for a long time. Defendant was apprehended the next day when he returned to Wal-Mart where he was arrested for shoplifting a cart full of food and camping supplies.

**B.    District Court Proceedings**

{9} On January 16, 2013, Defendant was charged by grand jury indictment with an open count of first-degree murder, unlawful taking of a motor vehicle, aggravated burglary, two counts of tampering with evidence, and shoplifting. At arraignment, Defendant pled not guilty to each of the six charges.

{10} While attorneys on both sides were conducting their investigations in preparation for trial, Defendant was evaluated for competency. The evaluation was

conducted by Dr. Eric Westfried, who met with Defendant on September 12 and 13, 2013. On September 24, 2013, Dr. Westfried sent an email to one of Defendant's attorneys, which read:

> I've made a half dozen attempts to call you, and had no success. I left a message with [a member of your staff] last week, but have not heard back from you.
> Briefly my conclusions:
> 1.) he is competent to stand trial;
> 2.) he may have lacked specific intent;
> 3.) he is not a good candidate for a risk assessment report.
> To pursue intent we need to gather records to support the argument. [Your staff member] will need to do that leg work. If you want to do that, let me know and I will guide [that staff member through] the process.

Another printout of that same email contains a handwritten note, apparently by the staff member referred to in the email, dated October 9, 2013, which read, "Per [Defendant's attorney:] he will speak to [the prosecutor and] get [back] to me on intent issue [sic]." There is nothing in the record reflecting any additional communications between defense counsel and Dr. Westfried, or defense counsel and the prosecutor, from the date the email was sent until November 23, 2013, when Dr. Westfried faxed his evaluation report to defense counsel. Dr. Westfried's report reflected his ultimate conclusion that Defendant was competent to stand trial, but it also noted that Defendant had a history of abuse and neglect and diagnoses of major

mental illnesses, including bipolar affective disorder, major depressive disorder, and post-traumatic stress disorder. Notably, the fax cover sheet with the competency report made reference to a "forthcoming specific intent report"; however, there is nothing in the record to conclusively show whether Defendant's attorney and Dr. Westfried actually discussed or further investigated the specific intent issue.

{11}    On December 13, 2013, the district court issued an order, stipulated to by both parties, declaring Defendant competent to stand trial or enter a plea. The case was then set for a change of plea hearing, during which Defendant pled no contest to first-degree murder (felony murder), unlawful taking of a motor vehicle, and one count of tampering with evidence. In exchange for Defendant's plea, the State agreed to request that Defendant's sentences on each count run concurrently and to dismiss three charges—aggravated burglary, tampering with evidence, and shoplifting. The district court approved the change of plea under the agreement and scheduled the case for a sentencing hearing.

{12}    On the morning of Defendant's scheduled sentencing hearing, Defendant, through new counsel, filed a motion to withdraw his no contest plea based on his prior attorneys' failure to investigate and advise Defendant of the potential availability of a defense based on a lack of specific intent. The district court agreed

7

to hear the motion, and scheduled a hearing to occur approximately one month later so as to allow the State to respond to the motion and to give both parties time to prepare and present evidence.

{13}     The hearing on Defendant's motion to withdraw his plea was held on May 13, 2014. Defendant did not present witness testimony from either Dr. Westfried or his prior attorneys, but instead relied upon his own testimony, Dr. Westfried's report, and the September 24, 2013, email from Dr. Westfried concerning the specific intent investigation. Defendant testified that his two prior attorneys had each only met with him one or two times, for approximately ten to fifteen minutes. He stated that neither attorney had discussed potential defenses based on lack of specific intent or insanity, nor had they explained that Defendant would not receive good time credit against a life sentence for pleading to first-degree murder. Defendant also testified that if he had known about the possible defenses, he would not have pled guilty to the charges.

{14}     The district court denied Defendant's motion to withdraw the plea. The district court stated that it was "arguable" that the attorneys had fallen below the standard of reasonableness, but the evidence on the issue was "weak and insufficient to overcome the strong presumption that the attorneys' conduct was sound trial strategy." The district court was also unpersuaded that Defendant had been prejudiced by the

conduct of his prior attorneys, noting that the only evidence presented on the issue was Defendant's testimony during the hearing that he would have gone to trial if he had received advice about the potential defenses. In its written order denying the motion, the district court stated, "The Defendant's self serving statements are insufficient given the record of the case and the strength of the State's case."

{15} Defendant's sentencing hearing took place on August 22, 2014. The district court ordered that Defendant's sentences on each charge "be served consecutively for a total of life plus [four and a half] years." Defendant appealed the denial of his motion to withdraw his plea to this Court. *See* 12-102(A)(1) NMRA ("[A]ppeals from the district courts in which a sentence of . . . life imprisonment has been imposed" "shall be taken to the Supreme Court.").

## II.    DISCUSSION

### A.    Standard of Review

{16} We review the district court's denial of a motion to withdraw a plea for an abuse of discretion. *State v. Hunter*, 2006-NMSC-043, ¶ 11, 140 N.M. 406, 143 P.3d 168. "A trial court abuses its discretion when it denies a motion to withdraw a plea that was not knowing or voluntary." *Hunter*, 2006-NMSC-043, ¶ 12. "This standard [applies] on appeal to all motions to withdraw a plea, whether prior to or following

9

sentencing." *Id*. ¶ 11. "Where, as here, a defendant is represented by an attorney during the plea process and enters a plea upon the advice of that attorney, the voluntariness and intelligence of the defendant's plea generally depends on whether the attorney rendered ineffective assistance in counseling the plea." *State v. Favela*, 2015-NMSC-005, ¶ 9, 343 P.3d 178 (internal quotation marks and citation omitted). In order for a defendant to present a successful claim of ineffective assistance of counsel, that defendant bears the burden of demonstrating: "(1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense." *Id*. ¶ 10 (internal quotation marks and citation omitted). These two parts of the test for ineffective assistance of counsel are referred to as the reasonableness prong and the prejudice prong, respectively.

**B.      Reasonableness of Counsel's Performance**

{17}      "Counsel's performance is deficient if it fell below an objective standard of reasonableness." *Hunter*, 2006-NMSC-043, ¶ 13 (internal quotation marks and citation omitted).

> Because of the difficulties inherent in making the [reasonableness] evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

10

*Strickland v. Washington*, 466 U.S. 668, 689 (1984) (citation omitted). Thus, in this case, in order to satisfy the reasonableness prong, Defendant must show that no reasonably competent attorney would have performed as his attorneys did in their alleged failure to investigate and advise Defendant of the potential defenses or the unavailability of good time credit. *See Patterson v. LeMaster*, 2001-NMSC-013, ¶ 19, 130 N.M. 179, 21 P.3d 1032.

{18}     Defendant relies on *United States v. Kauffman*, 109 F.3d 186 (3rd Cir. 1997), to support his position that his plea counsel fell below the requisite level of reasonable competence. In *Kauffman*, the Third Circuit Court of Appeals ordered a new trial as a result of the ineffective assistance of the defendant's attorney, who failed to investigate an insanity defense even though he had received a letter from the defendant's psychiatrist indicating that the defendant was manic and psychotic at the time of the crime. *Id*. at 190-91. During Kauffman's hearing on his ineffective assistance of counsel claim, his former attorney testified that "even though he had a letter from Kauffman's psychiatrist concerning Kauffman's mental condition, he did not pursue *any* investigation into an insanity defense." *Id*. at 190. The attorney specifically "admitted to having no conversation about Kauffman's mental status with any physician or making any review of the medical records, or doing any research on

11

the federal insanity defense." *Id*. at 188. In addition to his plea counsel, Kauffman called two physicians and another mental health counselor who had treated him around the time of his alleged crimes. *Id*. at 188-89. All three mental health professionals testified concerning Kauffman's unstable mental health and history of mental illness. *Id*.

{19}     The *Kauffman* Court ultimately determined that there was "no reasonable professional calculation which would support [Kauffman's attorney's] failure to conduct *any* pre-trial investigation into the facts and law of an insanity defense under the circumstances of [that] case." *Id*. at 190. The *Kauffman* Court also noted that if the attorney "had investigated Kauffman's long history of serious mental illness, and conducted *some* legal research regarding the insanity defense . . . his counseling [could] be characterized as 'strategy.' " *Id*. However, the complete failure to investigate the issue "fell below an objective standard of reasonableness," and therefore the evidence was sufficient to satisfy the first prong of the test for ineffective assistance of counsel. *Id*.

{20}     While at first glance *Kauffman* appears factually similar to Defendant's case, there are important differences between the two. First, in *Kauffman*, the attorney whose performance was the subject of the ineffective assistance of counsel inquiry

12

was called to testify at the hearing and admitted that he conducted no research into the insanity defense in the course of his representation of the defendant. *Id*. at 188, 190. In contrast, here Defendant did not call either of his prior attorneys to testify concerning their representation of Defendant. Instead, Defendant relied upon an email from Dr. Westfried referring to a handful of unsuccessful attempts to contact one of Defendant's attorneys. This evidence did not provide any information concerning whether Dr. Westfried was ultimately able to reach Defendant's attorneys, whether there was ever any discussion between Dr. Westfried and Defendant's attorneys concerning specific intent, or whether Defendant's attorneys conducted further research or investigation on specific intent.

{21}     Also, the nature of the information provided by the defendant's doctor in *Kauffman* is quite different from what Dr. Westfried provided here. In *Kauffman*, the opinion expressed in the doctor's letter to counsel was conclusive and its exculpatory value apparent—"Kauffman was manic and psychotic 'at the time of the committing of the crime he was charged with.' " *Id*. at 188. That type of medical opinion supports the availability of an insanity defense. *See id.* (recognizing the "exculpatory nature" of the letter); UJI 14-5101 NMRA ("The defendant was insane at the time of the commission of the crime if, because of a mental disease . . . the defendant:" either (1)

13

"did not know what [he or she] was doing or understand the consequences of [his or her] act," (2) "did not know that [his or her] act was wrong," or (3) "could not prevent [himself or herself] from committing the act."). At Kauffman's hearing, three additional mental health professionals testified on his behalf, providing "substantial evidence which would support Kauffman's claim that an insanity defense was . . . viable." *Id.* at 188-89. On the other hand, here the email from Dr. Westfried only indicated that Defendant "may have lacked specific intent." Such a statement is not conclusive or even strong support for the viability of such a defense. *See State v. Boyett*, 2008-NMSC-030, ¶ 27, 144 N.M. 184, 185 P.3d 355 ("The defense of inability to form specific intent allows a defendant to avoid culpability for willful and deliberate murder whenever he or she was unable to form the specific intent required to commit the crime."). Further, unlike the medical professionals in *Kauffman*, who rendered opinions within their own medical expertise, the inconclusive statement from Dr. Westfried was relayed in legal terms without explanation of the observations, expert opinions, or diagnoses that might support a specific intent defense for Defendant. *See Boyett*, 2008-NMSC-030, ¶ 27 (explaining that a defense based on lack of specific intent requires "evidence of the condition of the mind of the accused at the time of the crime, together with the surrounding circumstances" to

14

demonstrate that, because of intoxication or mental disease or disorder, the defendant was unable to form specific intent (internal quotation marks and citation omitted)). And like Defendant's attorneys, Dr. Westfried was not called to testify at the hearing to provide additional information that might support Defendant's claims.

{22} Keeping in mind, as the district court did, that an attorney's conduct is presumed to have been effective and Defendant bears the burden of demonstrating otherwise, it is unclear why Defendant failed to call Dr. Westfried or his prior attorneys to testify at the motion hearing to provide support for his claims. The district court was not persuaded that Defendant had "overcome the strong presumption that the attorneys' performance was sound trial strategy, [and that they decided] not to look into this because the evidence wasn't there." Defendant failed to create a record that would rule out the possibility that his attorneys' conduct could be explained by "a plausible, rational strategy or tactic" because the evidence Defendant presented did not show what his attorneys' conduct actually was. *State v. Jacobs*, 2000-NMSC-026, ¶ 49, 129 N.M. 448, 10 P.3d 127. To conclude that Defendant's attorneys acted unreasonably based on the email from Dr. Westfried without more evidence showing what the attorneys did would require this Court to speculate about matters for which Defendant has not provided an evidentiary basis.

*See Romanesco v. Barber*, 1968-NMSC-066, ¶ 11, 79 N.M. 83, 439 P.2d 919 ("We, of course, will not speculate on questions requiring the assumption of facts."). The district court properly concluded that the limited evidence presented at the hearing on Defendant's motion to withdraw the plea was insufficient to establish an evidentiary basis that would support a finding that the performance of Defendant's plea counsel was objectively unreasonable. Given the scant evidence presented at the hearing, the district court did not abuse its discretion in determining that Defendant failed to meet his evidentiary burden to demonstrate that his attorneys were ineffective.

**C.     Prejudice**

{23}     A claim of ineffective assistance of counsel can only prevail where a defendant demonstrates that the attorney's conduct was unreasonable *and* that the defendant suffered prejudice as a result. *Favela*, 2015-NMSC-005, ¶ 10; *see also Jacobs*, 2000-NMSC-026, ¶ 51 ("Failure to prove either prong of the test defeats a claim of ineffective assistance of counsel."). Where, as here, a defendant has failed to demonstrate that the attorney's performance was deficient, there can be no claim that any such deficiency prejudiced the defendant. Thus, because Defendant failed to meet his burden of showing that his attorneys' performance was deficient we find it

16

unnecessary to address Defendant's prejudice arguments.

**III.    CONCLUSION**

{24}    Defendant has not met his evidentiary burden of showing that he received ineffective assistance of counsel such that the district court abused its discretion in denying his motion to withdraw his no contest plea. The order of the district court is affirmed.

{25}    **IT IS SO ORDERED.**

 

_____

**BARBARA J. VIGIL, Chief Justice**

**WE CONCUR:**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**CHARLES W. DANIELS, Justice**

_____
**JUDITH K. NAKAMURA, Justice**